[No. 14461-8-I. Division One. September 16, 1985.]

THE STATE OF WASHINGTON, *Appellant,* v. CHARLES R. HATLEY, *Respondent.*

*David F. Thiele, Prosecuting Attorney,* and *David L. Jamieson, Jr., Deputy,* for appellant.

*Wolfe & Cullen* and *James E. Lobsenz,* for respondent (appointed counsel for appeal).

SCHOLFIELD, A.C.J.—The State appeals an order granting a new trial to defendant Charles R. Hatley and the denial of its motion for reconsideration of that order. Hatley cross–appeals, contending that (1) the court's reasonable doubt instruction was erroneous, (2) the court erred in admitting two gruesome photographs of one of the victims, (3) his claim of "imperfect" self–defense reduced the degree of homicide to manslaughter, and (4) the State improperly commented upon his right to remain silent. We reverse.

## FACTS

Hatley was charged with the first degree murder of Hector Alvarez and Paula Vanderveen and the unlawful pos-

session of a controlled substance (cocaine). Alvarez and Vanderveen were shot and killed at about midnight on March 16, 1983, in a tavern parking lot in Langley on Whidbey Island. Alvarez was shot in the face from approximately 12 to 18 inches away while sitting in the driver's seat of his car. Vanderveen was shot through the back of her head at point blank range while standing next to the passenger side of the car.

Elizabeth Ann Chamberlin lived in a second–story apartment nearby. She heard the first shot, then loud voices, and went to her window. She saw two figures struggling and then heard a woman's voice cry out, "Please, don't", and then, "I'll run from you", followed by a second shot. Chamberlin then saw a car, later identified as Hatley's, speed from the scene.

Hatley was apprehended within minutes approximately 4 miles away. Blood and tissue were removed from his body and clothing. A .44 magnum revolver with two expended rounds and four unexpended rounds was discovered on the floor of his car. An amount of cocaine, drug paraphernalia, and the wallet of Hector Alvarez were seized from his person. Expert witnesses testified that the residue on Hatley's hands was consistent with the recent firing of a handgun and that the tissue removed from his body and clothing matched Vanderveen's.

Hatley's testimony may be summarized as follows: He was a cocaine middleman in need of a new source for the drug. He met Vanderveen at a friend's house for the first time that day, and she told him that she had a good cocaine connection. He was in the process of sampling cocaine to purchase it from Vanderveen and her connection, Alvarez, when they attempted to rob him. He handed over all the money in his possession and then became very nervous when they discovered that an envelope that he was carrying did not contain any money. He knocked Vanderveen's gun out of her hand and pulled his own. He did not remember shooting Alvarez. He remembered struggling with Vanderveen and falling down, but did not remember shooting her

or driving away. The next thing that he remembered was being stopped by the police.

The State charged Hatley with committing the murders either with premeditation or during the course of a felony (robbery). The jury found Hatley guilty on all counts, including the premeditated and felony murder of Vanderveen, but only the felony murder of Alvarez.

Hatley moved for a new trial based on the alleged misconduct of juror Joseph Hamernik. Elmer Wolford testified at an evidentiary hearing that he had been hitchhiking when Hamernik picked him up. He testified that he knew Hamernik as an acquaintance from high school. He testified that Hamernik told him that he was sitting on a jury and that the defendant on trial was "guilty as sin."

On cross examination, Wolford stated that Hamernik had not discussed any of the evidence in the case. He also disclosed that he knew nothing about Hatley or the murders and that he had not urged Hamernik to find Hatley guilty.

At the hearing, Hamernik admitted that he had picked up Wolford during the second week of the 3–week trial, but denied that he had ever expressed any opinion about Hatley's guilt. He also testified that he had listened to all the witnesses and that when deliberations began, he did not have a fixed opinion, but, rather, had discussed the case with the other jurors. However, when asked directly whether he had made up his mind before or after the jury began to deliberate, he stated that it had been before.

The trial court found that the conversation between Hamernik and Wolford had taken place and that Wolford had been truthful when he testified that Hamernik had said that Hatley was "guilty as sin." It found that Hamernik had made his final decision concerning Hatley's guilt or innocence before the jury had retired to deliberate. The court held that Hamernik's misconduct demonstrated bias and prejudice and that Hatley's right to a fair trial before an impartial jury had been violated. The court granted Hatley's motion for a new trial.

The State moved for reconsideration. It presented the affidavits of six jurors, some of whom stated that Hamernik was one of three jurors who were the last to agree that Hatley was guilty of the felony murder of Alvarez, and some of whom stated that they had seen Hamernik change his vote during deliberations on at least one occasion. The court denied this motion.

## JUROR MISCONDUCT

The State contends that the evidence concerning when Hamernik decided upon Hatley's guilt was inadmissible because it "inhered in the verdict". It also contends that, even if this evidence were admissible, the fact that Hamernik made up his mind before deliberations began does not mean that he was prejudiced and that therefore a new trial was required.[1] We agree.[2]

■ Testimony may not be considered if "'the facts alleged are linked to the juror's motive, intent, or belief, or described their effect upon him'"; however, it may be considered if "'that to which the juror testifies can be rebutted by other testimony without probing a juror's mental processes.'" *State v. Crowell,* 92 Wn.2d 143, 146, 594 P.2d 905 (1979) (quoting *Gardner v. Malone,* 60 Wn.2d 836, 841, 376 P.2d 651, 379 P.2d 918 (1962)). Evidence concerning the mental processes of jurors, including their expressed opinions, *State v. Aker,* 54 Wash. 342, 345–46, 103 P. 420 (1909), and when they made up their minds, *Hosner v. Olympia Shingle Co.,* 128 Wash. 152, 154–55, 222 P. 466 (1924) inheres in the verdict. *See State v. Hall,* 40 Wn.

---

[1]The State also contends that the trial court's finding that Hamernik made up his mind before the jury began deliberations is not supported by substantial evidence. Although Hamernik's testimony was somewhat ambiguous, when directly asked whether he had made up his mind before or after the jury began to deliberate, he answered that it had been before. Thus, the trial court's finding is supported by substantial evidence.

[2]We note that although a finding of abuse of discretion is ordinarily required for an appellate court to reverse an order granting or denying a motion for a new trial, this principle does not apply when the trial court errs in applying the law. *State v. Crowell,* 92 Wn.2d 143, 145, 594 P.2d 905 (1979).

App. 162, 169, 697 P.2d 597 (1985) (third party's impression that juror had made up mind before end of trial inheres in verdict).

The trial court improperly considered both Wolford's testimony regarding Hamernik's statement of Hatley's guilt and Hamernik's testimony regarding when he made up his mind. The facts alleged in this testimony were "linked to [Hamernik's] motive, intent, or belief", *Crowell,* at 146; they concerned his mental processes. The need for finality in litigation requires a public policy making inadmissible evidence that inheres in a jury verdict. If every verdict were subject to impeachment if the losing side could obtain an affidavit indicating that in making up his or her mind, the juror reached certain critical conclusions prior to commencement of deliberations, disregarded some evidence, misunderstood an instruction, misapplied the rules of law, or completely misunderstood the testimony of one or more witnesses, then a jury verdict would simply be the first round in an interminably prolonged trial process. We hold that the evidence in this case should not have been considered because it directly involved Hamernik's thought processes and therefore inhered in the verdict. *Gardner v. Malone, supra.*

We also agree that even if Hamernik did make up his mind before deliberations began, this misconduct does not mean that he was prejudiced or biased. In *Tate v. Rommel,* 3 Wn. App. 933, 478 P.2d 242 (1970), *review denied,* 78 Wn.2d 997 (1971), the trial court found that a juror had formed a conclusion and expressed an opinion as to the proper outcome of the case after only the first day of trial. The trial court concluded that the juror was not fair and impartial and granted a new trial, holding that such misconduct was prejudicial. The Court of Appeals reversed. It held that because the juror had not been biased before the trial and because he had not based his opinion regarding the ultimate outcome of the case on evidence received outside of the trial, his misconduct was not prejudicial. We

find Judge Green's reasoning leading to this result quite persuasive:

> Common experience indicates a juror, or a judge, may form impressions or opinions as to the outcome of a case as he hears each bit of evidence. These impressions or opinions may change from time to time throughout the case. Such opinions or impressions normally are not revealed, and they should not be revealed, until the case is ready for decision. Here, juror Cyrus revealed his private opinion after the first day of trial. It is not unreasonable to expect that many of the other jurors, had they been questioned during the trial, would have formed some like opinion as to the outcome as did juror Cyrus. If we were to adopt the trial court's conclusion that the mere revealing of his private opinion or impression constitutes such misconduct as to justify a new trial without a further showing that such misconduct prejudiced the outcome of the trial, it would open the door to interrogation of jurors after trial for the purpose of discovering such unrevealed opinions as a basis for the filing of a motion for new trial.

*Tate v. Rommel, supra* at 937.

In this case, a review of Hamernik's voir dire examination reveals that he had no existing bias, and Hatley does not contend that Hamernik gave any false answers at that time. Also, Wolford admitted that Hamernik did not discuss the evidence in the case with him, and Hatley does not contend that Hamernik received any information from Wolford about the case. Hamernik's opinion regarding Hatley's guilt was based solely on the evidence presented at trial. Although it was misconduct for him to express an opinion before deliberations began, it did not deny Hatley a fair trial. We reverse the order granting Hatley a new trial.[3]

---

[3]Hatley contends that whether or not a juror is impartial is a question of fact, relying on *Patton v. Yount,* ___ U.S. ___, 81 L. Ed. 2d 847, 104 S. Ct. 2885 (1984) and *Reynolds v. United States,* 98 U.S. 145, 25 L. Ed. 244 (1879). He argues that the trial court's determination that Hamernik was not impartial is supported by substantial evidence. However, *Patton* and *Reynolds* involved challenges for cause against prospective jurors. Whether a juror who has prematurely formed an opinion based only upon the evidence presented at trial is impartial is a question of

## REASONABLE DOUBT INSTRUCTION

Hatley cross–appeals, contending that the trial court erred by instructing the jury "not to go beyond the evidence to hunt up doubts". Instruction 4.[4] He argues that this portion of the reasonable doubt instruction conflicted with the provision that a reasonable doubt may arise from "a lack of evidence".[5]

 In deciding whether the trial court erred in giving a reasonable doubt instruction providing that a reasonable doubt must be a "substantial" one, the Washington Supreme Court recently reasoned:

Washington courts have approved various forms of instructions, so long as a reviewing court can determine from the totality of the circumstances whether the jury was adequately informed of the allocation of the burden of proof. The specific language of the instructions is left to the discretion of the trial court.

. . .

We agree with the *Flores* [*State v. Flores*, 18 Wn. App.

---

law. *Tate v. Rommel*, 3 Wn. App. 933, 478 P.2d 242 (1970), *review denied*, 78 Wn.2d 997 (1971).

[4]The court's instruction 4 provided in full:

"The defendant has entered pleas of not guilty. Those pleas put in issue every element of the crimes charged. The state is the plaintiff and has the burden of proving each element of the crimes beyond a reasonable doubt.

"A defendant is presumed innocent. This presumption continues throughout the entire trial unless you find it has been overcome by the evidence beyond a reasonable doubt.

"The jury is further instructed that the doubt which entitles the defendant to an acquittal must be a doubt for which a reason exists. You are not to go beyond the evidence to hunt up doubts, nor must you entertain such doubts as are merely vague, imaginary, or conjectural. A reasonable doubt is such a doubt as exists in the mind of a reasonable man after he has fully, fairly, and carefully compared and considered all of the evidence or lack of evidence introduced at trial. If, after a careful consideration and comparison of all the evidence, you can say you have an abiding belief of the truth of the charge, you are satisfied beyond a reasonable doubt."

[5]Hatley contends that this issue may be raised for the first time on appeal, relying upon *State v. McHenry*, 88 Wn.2d 211, 558 P.2d 188 (1977). *McHenry* involved the complete failure to instruct regarding reasonable doubt. We shall assume, without deciding, that Hatley may raise this issue at this time.

255, 566 P.2d 1281 (1977), *review denied,* 89 Wn.2d 1014 (1978)] court that the use of the term "substantial" carries the potential for confusing the jury and should not be used as it invites error in every case. An instruction which does not define reasonable doubt in terms of "a substantial doubt" should be given. Nevertheless, in considering whether the use of the word "substantial" in this case constitutes error, we must consider the instruction in its entirety and the other instructions given in this case. The phrase, when read in the context of all of the instructions, would not improperly instruct the jury that the burden of proof was on the defendant or that the burden was less than proof beyond a reasonable doubt. To avoid any repetition of this issue, however, the instruction should not be given in future cases.

(Citations omitted.) *State v. Coe,* 101 Wn.2d 772, 787–88, 684 P.2d 668 (1984).

Although the portions of the instruction at issue in this case are potentially confusing when read together, the instruction did not improperly place the burden of proof upon the defendant or provide that the burden was less than proof beyond a reasonable doubt. When the instruction is considered in its entirety and with the other instructions, there was no error. However, we recommend that in future cases, the portion of the instruction objected to not be given. *See* WPIC 4.01.

### ADMISSION OF PHOTOGRAPHS

Hatley next contends that the trial court abused its discretion in admitting two photographs. The photographs were taken at the crime scene and showed Paula Vanderveen dead on the pavement with the remains of her brain lying next to her. Hatley argues that under ER 403, any probative value of the photographs was far outweighed by their possible prejudicial effect. We do not agree.

■ The admissibility of photographs lies within the sound discretion of the trial court, and its decision will not be disturbed absent abuse of that discretion. *State v. Crenshaw,* 98 Wn.2d 789, 806, 659 P.2d 488 (1983). Even gruesome photographs may be admitted, if their probative

value outweighs their prejudicial effect. *State v. Crenshaw, supra.* However, if the prejudicial effect of photographs outweighs their probative value, admission is error. *State v. Sargent,* 40 Wn. App. 340, 347, 698 P.2d 598 (1985).

The photographs in this case revealed the conditions at the scene and the damage to Vanderveen caused by the gunshot. They were probative because they rebutted Hatley's claim of self–defense or accident by supporting the testimony of the State's expert witnesses that the murder weapon was held against Vanderveen's head or at point–blank range. They were also somewhat probative in confirming that a large caliber weapon had been used. Finally, we note that the State offered only two of a number of photographs of the crime scene, one from in front of Vanderveen and one from behind her, in an attempt to limit potential prejudice. Although gruesome, they must be considered in light of the realities of the facts that the State was required to prove. "'[A] bloody, brutal crime cannot be explained to a jury in a lily–white manner'". *State v. Crenshaw, supra* at 807 (quoting *State v. Adams,* 76 Wn.2d 650, 656, 458 P.2d 558 (1969), *rev'd on other grounds,* 403 U.S. 947, 29 L. Ed. 2d 855, 91 S. Ct. 2273 (1971)). We hold that the trial court did not abuse its discretion in admitting the photographs.

## "IMPERFECT" SELF–DEFENSE

Hatley also contends that the trial court erred in failing to instruct the jury, sua sponte, that if he had committed the killings under the honest, but unreasonable, belief that it was necessary to act in self–defense, he should be found guilty of manslaughter rather than murder.

■ This contention should be addressed to the Legislature. The only form of self–defense recognized in this state requires that the actor's belief that resort to self–defense is necessary be reasonable. *See* RCW 9A.16.020(3); RCW 9A.16.050; *State v. Wanrow,* 88 Wn.2d 221, 559 P.2d 548 (1977). We find no error.

## Right To Remain Silent

Finally, Hatley contends that the State's cross examination of him and the State's questions to Deputy Sheriff Proft during Proft's rebuttal testimony amounted to impermissible comments on his right to remain silent.

It appears to be undisputed that after Proft arrested Hatley, he advised him of his constitutional rights in accordance with *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), which included his right to remain silent. Proft testified that he then asked Hatley what had happened at Langley and Hatley replied, "'I was definitely there.'" In response to another question by Proft, Hatley said it "was just a matter of one thief ripping off another." In further response to questions, Hatley said it involved cocaine.

The events immediately preceding the shooting commenced, according to Hatley, with Vanderveen pointing a gun at him and in concert with Alvarez and another person attempting to rob him while the four of them were sitting in an automobile. Hatley admitted he carried a .44 caliber Ruger with him to the meeting with Alvarez. He testified he resisted the robbery, but had no recollection of ever actually shooting Vanderveen and Alvarez. He also said he did not recall telling Proft that the incident in Langley was one of one thief ripping off another.

On cross examination, the deputy prosecuting attorney asked Hatley, "Now, you never told any officer, either Detective Proft or any other policeman that anybody had pointed a gun at you in Langley, did you?" Hatley responded, "I don't recall ever telling anybody anything about it." The matter was raised again later on cross examination as follows:

Q . . . Now, you never told Detective Proft or any other police officer that anyone took money from you on the 16th of March, 1983, in Langley, did you?

A I don't remember the whole gist of the conversation.

Q So is that the answer, you don't remember whether you told them or not?

A I remember very, very little about that conversation.

Q Okay. Your answer is you don't remember telling them, whether or not you told them that?

A I don't remember telling them yes.

Hatley also was asked on cross examination if he denied killing Paula Vanderveen and Hector Louis Alvarez, and he answered, "No, I don't."

On redirect, Hatley's counsel asked him the following question, "When the police officers were apparently asking you questions on the scene, did you elect to remain silent or were you . . ." To this question, Hatley responded, "Mr. Skinner, I don't really know if I elected to remain silent or what I was doing. The only thing I remember doing is I was just trying to get myself some cigarettes and I was just going through any means I could to get smokes."

The State recalled Detective Proft as a rebuttal witness and asked this question, "Now, would you state whether or not during your conversation the defendant told you whether anybody pointed a gun at him or tried to rob him of any money." Hatley's counsel objected to the question on the grounds that it was improper rebuttal and that it violated Hatley's right to remain silent. After extended argument, the court sustained the objection. No instruction was given to the jury to disregard the question, and none was requested.

In *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), the Court held that the due process clause of the Fourteenth Amendment prohibits impeachment on the basis of a defendant's exercise of the right to remain silent following *Miranda* warnings. The defendants in *Doyle* made no post–arrest statements about their involvement in the crime. At trial, they testified that they had been framed. On cross examination, they were asked why they had not told the police about the frame prior to trial. The Court held such impeachment unfair because the *Miranda* warnings advise suspects of the right to remain silent and impliedly give assurance that such silence will not be used against them.

In *Anderson v. Charles,* 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180 (1980), the defendant told a police officer after receipt of *Miranda* warnings that the subject car had been stolen from a certain street location. At trial, he testified he took the car from a parking lot near the jail. The defendant was asked on cross examination whether he thought it was "rather odd that if it were the truth that you didn't come forward and tell anybody at the time you were arrested, where you got that car?" *Anderson,* at 406. The Supreme Court affirmed the conviction and held that *Doyle* was not controlling because the defendant did not remain silent, but elected to make a statement that involved the facts of the case.

 We read the Court's opinion in *Anderson* as holding that the decision in *Doyle* is a rather narrow one that prohibits impeachment based on the defendant's exercise of that right to remain silent. If the defendant does not exercise that right, but makes one or more statements involving the facts of the case, then he or she has not exercised the right to remain silent and is subject to the rules normally governing cross examination. This conclusion is consistent with other cases addressing essentially the same issue. *See United States v. Agee,* 597 F.2d 350 (3d Cir. 1979); *United States v. Goldman,* 563 F.2d 501 (1st Cir. 1977), *cert. denied,* 434 U.S. 1067 (1978); *United States v. Mireles,* 570 F.2d 1287 (5th Cir. 1978).

It is noteworthy that Hatley gave no indication to Detective Proft that he desired to exercise his right to remain silent, nor did he make any such claim at trial. We are satisfied that Hatley was not exercising his right to remain silent when he failed to give more details in response to Detective Proft's questions. *See Anderson v. Charles, supra.*

Also, Hatley had Alvarez' wallet with him when arrested. His statement about "one thief ripping off another" is ambiguous. It could be interpreted as an admission that the shooting occurred during a robbery of the victims by Hatley and thus support the charge of felony murder. It could also

be interpreted as a claim that he was a victim of an attempted robbery and killed in self–defense. Cross examination by the State was directed toward showing that Hatley's claim of self–defense was not credible and therefore had a relevant and material purpose.

There was no error in permitting the cross examination.[6]

Reversed and remanded for further proceedings consistent with this opinion.

SWANSON and COLEMAN, JJ., concur.

Review denied by Supreme Court November 8, 1985.

---

[6]The questions on cross examination were not objected to. However, because the issue directly involves a claimed denial of a constitutional right, we have treated the issue as properly before us, consistent with *State v. McCullum,* 98 Wn.2d 484, 656 P.2d 1064 (1983).